Jacob A. Gillick, SBN 312336
jgillick@PHGLawGroup.com
PHG Law Group
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone: (619) 826-8060
Facsimile: (619) 826-8065

Attorneys for Defendant Zeetogroup, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIGITAL MEDIA SOLUTIONS, LLC,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ZEETOGROUP, LLC,<br><br>　　　　Defendants. | Case No. 22CV1184 JLS AHG<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　　November 3, 2022<br>Time:　　1:30 p.m.<br>Dept:　　4D<br>Judge:　　Hon. Janis L. Sammartino |

# I. INTRODUCTION

In response to ZeetoGroup, LLC's ("ZG") Motion for Summary Judgment ("MSJ"), Plaintiff Digital Media Solutions, LLC ("DMS") feigns ignorance of the Agreement and completely glosses over terms like "Zeeto reserves the right to terminate this Agreement and investigate Publisher for deceptive practices at its sole discretion" and "Zeeto will not pay Publisher in the case of (as Zeeto may determine in its sole discretion): spam, fraud, submission of false leads/data."

DMS's Opposition to the MSJ requests this Court believe that the above quotes from the Publisher Terms of Service Agreement ("Agreement") indicate that ZG will parse out fraudulent traffic and pay for non-fraudulent traffic. This interpretation makes two very big assumptions, (1) that ZG would ever be ok with any kind of fraud being run through its property and, (2) that this would be the intention of the parties without stating it or describing sufficient procedures in the event this situation occurs. DMS's interpretation adds new terms to the agreement and requires inadmissible parol evidence.

As described below, ZG had the right to determine fraud, terminate the Agreement, and not pay DMS. There is no ambiguity, there is no waiver, there is no unenforceable right, and there is no basis put forward by DMS to invalidate the Agreement. DMS breached the Agreement by running fraudulent traffic through Zeeto's property. Therefore, DMS is unable to prove a genuine dispute of fact to support its first cause of action for Breach of Contract. ZG was also provided with sole discretion under the Agreement to find fraud and terminate the relationship. Therefore, DMS is unable to sustain its cause of action for Breach of the Implied Covenant of Good Faith and Fair Dealing. Finally, DMS does not even attempt to support its third cause of action for Business and Professions Code section 17200 violation. Nonetheless, ZG has always acted within its contractual rights and Plaintiff's third cause of action is appropriate for summary judgment.

# II. ARGUMENT

### A. The Agreement must be Construed from Its Four Corners

Plaintiff claims that "no discovery has yet taken place to establish the parties' objective beliefs as to their rights and obligations under the contract, their prior courses of conduct and whether in fact fraudulent clicks even exist." [Dkt. 12, 6:11-14.] This argument is contrary to California law for the interpretation of contracts.

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone." Cal. Civ. Code § 1639. If Plaintiff wishes to argue that there was no meeting of the minds, there would be no contract to file a cause of action on. "Absent any ambiguity, the provisions of a contract as written will govern." *Gruen Watch Co. v. Artists Alliance, Inc.,* 191 F.2d, 700, 703 (9th Cir. 1951). "Where language of contract is intelligible and explicit and does not involve any absurdity, it must govern its own interpretation." *Estate of Wamack* 137 Cal.App.2d 112, 117 (1955). "If language of instrument is clear and explicit, intention of parties must be ascertained from writing alone, for parol evidence is admissible only where language used is doubtful, uncertain, or ambiguous, and only then in cases where doubt appears on face of contract." *Eastern-Columbia, Inc., v. System Auto Parks, Inc.,* 100 Cal.App.2d 541, 545 (Cal. App. 1950).

Plaintiff has failed to submit or describe any evidence which would support a finding of uncertainty and support the admission of parol evidence. Instead, a declaration by Mr. Borghese (not the person who signed the Agreement between DMS and Zeeto) has been submitted stating that because there is an indemnity provision, ZG is ok with fraudulent traffic running through its system. [Dkt. 10-1, ¶ 8.] This is contrary to Mr. Goss's Declaration submitted prior which states that "DMS supplying fraudulent traffic to ZAN caused direct harm to Zeeto as well as its advertisers, thereby putting Zeeto in jeopardy of sullying its reputation which is based on selling high quality advertising space, free of fraudulent traffic." [Dkt. 6-2, ¶ 7.] Mr. Borghese then goes on to say that he would have never entered into the Agreement had he known that ZG would act on its rights. [Dkt. 10-1. ¶ 9.] DMS, a

REPLY TO MOTION FOR SUMMARY JUDGMENT 22CV1184 JLS AHG

competent party, did enter into the Agreement and these arguments are insufficient to sustain a finding of ambiguity to go outside the four corners of the Agreement.

### B. *Terms of the Agreement*

Given this relationship where Publishers like DMS supply traffic through procurement methods over which ZG has no insight, ZG implemented multiple safeguards in its Agreement to prevent DMS, or any other client, from attempting to send fraudulent traffic through ZG and then charging them for it. Pursuant to sections 3(c) through (e) of the Agreement: "<u>c. Prohibited Content.</u> Unless Zeeto provides prior written consent, you may not place the Zeeto Technology on any part of the Publisher Site containing the following: [fraud]."

> "<u>d. Deceptive Practices.</u> Zeeto reserves the right to terminate this Agreement and investigate Publisher for deceptive practices at its sole discretion." "<u>e. Damages.</u> If Zeeto determines that Publisher has violated any portion of this Section 3, Zeeto may withhold payment owed to Publisher." Dkt. 6-2, Exhibit 1. According to section four (4) of the Agreement: "You acknowledge and agree that Zeeto's tracking statistics will be used to determine the numbers upon which payment is made. **Zeeto will not pay Publisher in the case of (as Zeeto may determine in its sole discretion**): spam, fraud." *Id*.

Nothing about these terms are confusing or ambiguous. DMS requests that the contract be interpreted as ZG temporarily withholding payments and parsing out the fraudulent versus legitimate traffic. That language does not exist and there is no indication of how long that withholding would be proper for, how long the dispute process would take, how the dispute process would be conducted, and if there is any penalty for sending fraud through Zeeto's system. DMS's requested interpretation would *make* the contract confusing and ambiguous. The terms are clear: if there is fraud—*as ZG may determine in its sole discretion*—ZG can terminate the Agreement and refuse payment.

### C. *Fraud can be determined in Zeeto's Sole Discretion*

Plaintiff argues that "Defendant has failed to identify to DMS any 'fraudulent clicks' or 'hits.' Defendant has not provided any particular information with respect to its claim of 'fraudulent traffic,' such as how many clicks have occurred,

4

or the origination, or the identify of such allegedly 'fraudulent data.'" [Dkt. 12, 6-21-25.] The fraud confirmed by Anura, a third party, was included with Mr. Goss's Declaration. [Dkt. 6-2, Exhibits 2-3.] Any more detailed information would be burdensome to recover from Anura and ZG has no duty to undergo that expense before or after making its finding of fraud. Changing the Agreement to require a parsing process would force this Court to re-write the Agreement and add additional terms. *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 349-350 (2000).

DMS argues that "while acknowledging that ZG may have the right to judge fraudulent clicks, no language in the contract permits it not to pay for legitimate hits or clicks." [Dkt. 12, 10:4-6.] "Under the Defendant's apparent interpretation of the agreement, one fraudulent hit is sufficient to allow it to, in its 'sole discretion,' not pay DMS at all. [citation.] The contract does not say that, and DMS would never have agreed to such a one-sided and illusory agreement." [Dkt. 12, 10:9-12.]

DMS signed the Agreement, or at least Rob Camhe did, who has not provided a declaration in support of DMS to establish his intent when signing the Agreement. [Dkt. 6-2, Exh. 1.] Further, the terms are clear: according to section 3(e), "[i]f Zeeto determines that Publisher has violated any portion of this Section 3, Zeeto may withhold payment owed to Publisher." Pursuant to section 3(d) of the Agreement, ZG had the right to terminate the Agreement and investigate Publisher for deceptive practices at its sole discretion. Section four of the Agreement states that "**Zeeto will not pay Publisher** in the case of (as Zeeto may determine in its sole discretion)." Even section 11(b) of the Agreement states that, "[a]ll rights and remedies provided in this Agreement are cumulative and not exclusive," indicating that there is no parsing out of traffic and payments in the event of fraud.

Nonetheless, DMS wants payment calculated on the "good traffic as provided in Section 4 of the agreement [which] governs the parties' rights, and [] states that '. . . Zeeto's tracking statistics will be used to determine the number upon which payment is made.'" [Dkt. 12, 10:19-22.] DMS then argues that this section

5

"implies that Defendant Zeeto will pay for valid traffic." [Dkt. 12, 10:22-23.] DMS omits the very next sentence which reads that "Zeeto will *not pay* Publishers in the case of (as Zeeto may determine in its sole discretion): spam, fraud, submission of false leads/data, violation of this Agreement." [Dkt. 6-2, Exh. 1.] Further, this argument that ZG should pay for the non-fraudulent traffic, if there was any, is contrary to DMS's entire lawsuit seeking $944,176.27 plus interest. [Dkt. 1. ¶¶ 10-11.] ZG requests that this Court not add new provisions to the Agreement not contemplated by the parties.

    Parsing out of the traffic as part of ZG's standard agreement would also imply that ZG invites fraudulent traffic or will tolerate fraudulent traffic going through its system. There is nothing further from the truth or logic. [*See* Dkt. 6-2; "DMS supplying fraudulent traffic to ZAN caused direct harm to ZG as well as its advertisers, thereby putting ZG in jeopardy of sullying its reputation which is based on selling high quality advertising space, free of fraudulent traffic."] It can be expected that some fraudulent traffic may squeak through. In this case however, DMS went from virtually none to 25,000 and wants to be paid for it. *Id.* at Exhibits 2-3. ZG has the contractual right to terminate the agreement in the event of fraud. DMS has no right to seek performance under the contract when ZG has determined, and has proof that, fraud/a breach has occurred.

    Finally, DMS and Mr. Borghese attempt to argue that the right to stop making payments is contrary to the indemnity provision provided by the Agreement. [Dkt. 12, p. 11.] Indemnity and a contractual right are two separate rights and completely unrelated. As stated in the Agreement, Indemnity applies to "any and all third-party losses, liabilities, claims, damages, and costs." DMS is not a third party to its own Agreement and the Agreement clearly does not take a "wait to see if we get sued" approach. ZG had the right to determine fraud and terminate the Agreement under sections three and four. Notably, Plaintiff claims ignorance but does not deny the fraud—which is why no evidence has been submitted to

establish a genuine dispute of fact. Therefore, ZG requests its Motion for Summary Judgment be granted as to all causes of action.

### D. <u>No Wavier Occurred or is Permitted Under § 11 of the Agreement</u>

DMS argues that "Mr. Goss, in his declaration, admits that there were no problems with the hits over part of the time for which it owes DMS compensation, but ZG still refuses to pay even for what it admits is legitimate traffic." [Dkt. 12, 10:15-18.] This is another attempt by DMS to have the declaration misinterpreted. Instead, Mr. Goss's declaration explains the difference between April-June of 2021 reflecting little to no fraudulent traffic and July-September which reflects *25,000 instances of fraud.* [Dkt. 6-2, Exhibits 2- 3.] Nowhere is the fraud excused.

Even if there had been some fraud in the past, the contractual terms have not been waived. Section 11(f) of the Agreement states that "[t]he failure to enforce any performance by the other party of any provision of this Agreement or to exercise its rights under this Agreement shall not be deemed a waiver or relinquishment of such right, and no breach shall be considered excused unless such waiver is in writing." [Dkt. 6-2, Exh. 1.] DMS's argument of "waiver" therefore fails.

### E. <u>Plaintiff's First Cause of Action for Breach of Contract Fails</u>

To prevail on a cause of action for breach of contract, the plaintiff must prove, (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach and (4) the resulting damage to the plaintiff. *Richman v. Hartley*, 224 Cal.App.4th 1182, 1186 (2014).

DMS argues that "Zeeto does not dispute that DMS sent traffic during the months in question" and therefore performed under the Agreement. [Dkt. 12, 7:11-11-16.] DMS is attempting to hide the ball here. Mr. Goss was discussing the fraudulent traffic—not that DMS complied with the Agreement. [Dkt. 6-2.] Further, Mr. Goss states that "Zeeto also does not dispute that if the traffic had been free of fraud (as determined by Zeeto), then Zeeto would owe $944,176.27. Zeeto has discovered fraud and in its own discretion refuses to compensate DMS for

7

fraud." [Dkt. 6-2, ¶ 14.] The fraudulent traffic is prohibited under sections three and four of the Agreement. There is also no doubt that "Zeeto reserves the right to terminate" the Agreement in the event of fraud and not pay DMS. Finally, there is no dispute of the third-party verification evidencing over 25,000 fraudulent leads. [Dkt. 6-2, Exhibits 2-3.] DMS did not comply with the terms of the Agreement. Therefore, DMS is unable to sustain a cause of action for Breach of Contract.

### F. *Plaintiff's Second Cause of Action for Breach of the Covenant Fails*

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement made. The covenant thus cannot 'be endowed with an existence independent of its contractual underpinnings.' It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 349-350 (2000).

"The implied covenant of good faith and fair dealing cannot be read to require defendants to take a particular action that is discretionary under the contract when the contract also expressly grants them the discretion to take a different action. To apply the covenant to require a party to take one of two alternative actions expressly allowed by the contract and forgo the other would contravene the rule that the implied covenant of good faith and fair dealing may not be 'read to prohibit a party from doing that which is expressly permitted by an agreement." *Bevis v. Terrace View Partners, LP*, 33 Cal.App.5th 230, 256 (2019). ZG had discretion and just because DMS does not like it, does not mean it violates the implied covenant of good faith and fair dealing.

DMS argues that "Defendant interprets the contract to 'not pay publisher' as Defendant determines in its 'sole discretion.' [citation.] Defendants' interpretation of the Agreement not only runs afoul of the implied covenant of good faith, and fair dealing, but also, such an interpretation would make the Agreement entirely

illusory." [Dkt. 12, 8:17-19.] "Here, there is a genuine dispute of material fact as to interpretation of this allegedly 'unilateral' provision of the contract. Accepting Defendant's interpretation would render the contract illusory, preventing summary judgment. . . DMS interpretation of the contract, on the other hand, binds Defendant to pay the amounts owed to DMS." [Dkt. 12, 8:25-9:3.]

This argument regarding "unilateral termination" is confusing and only supported by a 1952 residential lease case which states that "[w]hile parties are free to contract for a lease on such terms as they please, their efforts are futile if they choose phraseology as permits one party to withdraw at his pleasure. Such a contract is void." *Cox v. Hollywood Film Enterprises, Inc.,* 190 Cal.App.2d 320, 325 (1952). Alternatively, the parties here agreed that ZG could have discretion. A decision made using that discretion does not support a cause of action for breach of the implied covenant of good faith and fair dealing. *Bevis v. Terrace View Partners, LP*, 33 Cal.App.5th 230, 256 (2019).

As for termination of the Agreement, section five grants both parties the right. [Dkt. 6-2, Exh. 1.] It is unclear what the "unilateral" right DMS is complaining of. It is also unsupported by any law or logic that DMS should be allowed to run fraud through ZG's system then deny ZG the right to terminate the Agreement or the right to "not pay" as provided in sections three and four. In that scenario, ZG would be hostage to facilitating DMS's fraud.

Instead of accepting the plain terms of the Agreement, DMS is attempting to add a new contractual term which states that "Zeeto must separate out fraudulent and legitimate traffic and pay DMS for the legitimate traffic." There is no support behind this contention. Summary judgment to this cause of action should be granted because the contractual terms are clear, unambiguous, and enforceable. The whole purpose of the Agreement was to be punitive in the event of fraud and to disincentivize DMS by making the total payment void, not just the fraudulent part. If only the fraud part was not paid for, DMS would have a huge incentive to

continue running fraudulent as Zeeto would have to figure out what was and what was not fraud, likely resulting in paid-for fraud. This is not provided anywhere in the Agreement.

### G. *Plaintiffs Third Cause of Action Fails*

DMS claims that "Plaintiff's third cause of action for violation of UCL is premised upon the same conduct as the first and second causes of action." [Dkt. 12, 9:18-21.] However, "unfair competition shall mean and include any unlawful, unfair or fraudulent act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. DMS agreed that ZG has sole discretion to determine if fraud had occurred and to not make payment in that event. [Dkt. 6-2 Exh. 1 § 3-4.] There is no dispute as to the validity of the Agreement or the meaning of its terms, therefore no valid cause of action against ZG exists. It was DMS that engaged in acts of unfair competition by using deceptive practices and running fraudulent traffic through ZAN. [Dkt. 6-2, Exhs. 2-3.]

The Agreement clearly states that ZG "will not pay Publisher as Zeeto may determine in its sole discretion" for fraud. *Id.* at § 4. DMS does not even attempt to argue the merits behind this cause of action and instead leaves it up to the Court, much like the new contractual provision DMS seeks to add. ZG therefore requests that Summary Judgment be granted as to this third cause of action.

### H. FURTHER DISCOVERY IS NOT NECESSARY

Plaintiff requests a Rule 56(d) extension based on the need to conduct discovery. However, Plaintiff has failed to "specifically identify[] relevant information, and where there is some basis for believing that the information sought actually exists." *VISA Int'l Servic Ass'n v. Bankcard Holders of America,* 784 F.2d. 1472, 1475 (9th Cir. 1986). Instead, DMS argues that it has had "no opportunity to conduct any discovery as to the allegations set forth in Defendant's instant motion for summary judgment, specifically with respect to the course of the parties, as it relates to the pertinent provisions of the Agreement at issue in the instant Motion.

[citation]. Plaintiff will depose Mr. Goss within the next 30 days to discover the information related to these issues." [Dkt. 12, 13:25-14:3.]

The history of the Summary Judgment procedure shows that it is "intended to permit a party to pierce the allegations of fact in the pleadings and to obtain relief by summary judgment where facts set forth in detail in affidavits, depositions, and admissions on file show that there are no genuine issues of fact to be tried." *Engl. v. Aetna Life Ins. Co.,* 139 F.2d 469, 472 (2nd Dist. 1943). "Summary judgment is to be used not as a substitute for trial, but only when it is quite clear what the truth is and that no genuine issue remains for trial." *In re: Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 538 F.2d 180, 184 (8th Dist. 1976).

Nowhere does Plaintiff explain how this discovery will be relevant to the action or make any difference as to the interpretation of the contractual terms. There is also no basis to believe any information would exist that could change the outcome or interpretation of a contract. *See* Cal. Civ. Code § 1639. Discovery would provide no new information or change the actual terms of the Agreement— which is why Plaintiff was unable to identify the discovery with specificity. Therefore, ZG requests this Rule 56(d) declaration be denied and Summary Judgment be granted as to all causes of action.

### III. <u>CONCLUSION</u>

In sum, in an effort to defeat Zeeto's motion for summary judgment, DMS's attempts to add new contractual provisions or posture the Agreement as "ambiguous." The terms are clear that ZG does not have to pay in the event of fraud. (Notably, DMS does not deny fraud occurred.) Further, fraud is a breach of the Agreement which terminates DMS's rights to recover on it. Based on the failure of DMS to identify any specific discovery needed or raise a genuine dispute of fact, ZG requests that its Summary Judgment Motion be granted for all causes of action.

Dated: October 27, 2022         *s/ Jacob A. Gillick*
                                Jacob A. Gillick, Esq.
                                Attorneys for Defendant Zeetogroup, LLC

11

REPLY TO MOTION FOR SUMMARY JUDGMENT         22CV1184 JLS AHG