Mark E. Ellis – 127159
*mellis@ellislawgrp.com*
Lawrence K. Iglesias – 303700
*liglesias@ellislawgrp.com*
ELLIS LAW GROUP, LLP
1425 River Park Drive, Suite 400
Sacramento, CA  95815
Tel: (916) 283-8820
Fax: (916) 283-8821

Attorneys for Plaintiff DIGITAL MEDIA SOLUTIONS, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIGITAL MEDIA SOLUTIONS, LLC,<br><br>     Plaintiff,<br><br>v.<br><br>ZEETOGROUP, LLC,<br><br>     Defendant. | Case No.:  22-cv-01184 AHG (Consolidated with No. 3:22-cv-01396 AHG)<br><br>**DECLARATION OF LAWRENCE K. IGLESIAS IN SUPPORT OF PLAINTIFF DIGITAL MEDIA SOLUTIONS, LLC'S OPPOSITION TO DEFENDANT ZEETOGROUP'S MOTION FOR SUMMARY JUDGMENT**<br><br>**DATE:**    **August 9, 2023**<br>**TIME:**    **1:30 p.m.**<br>**DEPT:**    **5A**<br>**JUDGE:**  **Hon. Allison H. Goddard** |

I, Lawrence K. Iglesias, declare:

1.    I am an attorney at law duly licensed to practice before this Court, and I am an associate in the law firm of Ellis Law Group LLP, attorneys of records for Plaintiff DIGITAL MEDIA SOLUTIONS, LLC in the above matter. This declaration is based upon my own personal knowledge.  If called as a witness to testify to the matters asserted herein I would do so competently.

2.    Plaintiff, Digital Media Solutions, LLC filed this action on August 12, 2022.

- 1 -

ECF. No. 1.

3.      Defendant Zeetogroup, LLC ("Defendant") filed its Answer on August 7, 2022. ECF No. 4.

4.      Defendant filed its instant Motion for Summary Judgment on July 12, 2023. ECF. No.39.

5.      A true and correct copy of excerpts transcript of the July 24, 2023 deposition of Stephan Goss are attached hereto as **Exhibit 4**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 26, 2023

_____
LAWRENCE K. IGLESIAS

- 2 -

# EXHIBIT 4

US DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---oOo---

DIGITAL MEDIA SOLUTIONS,
LLC,

        Plaintiff,

-vs-                    CASE NO. 22CV01184 JLS-AHG

ZEETOGROUP, LLC,

        Defendant.

_____/

**CERTIFIED COPY**

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

STEPHAN GOSS

July 24, 2023

Reported By: Cynthia Ornelas, CSR 9402

Deposition of STEPHAN GOSS                              DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC

```
 1                         I N D E X

 2                                                      PAGE

 3   EXAMINATION BY MR. ELLIS                             5

 4

 5

 6
                      E X H I B I T S
 7
                                                       PAGE
 8
     PLAINTIFF'S
 9
     Exhibit 1   Zeeto Publisher Terms Of Service        32
10
     Exhibit 2   E-Mail Chain                            67
11
     Exhibit 3   Documents Attached To Settlement        71
12               Letter

13   Exhibit 4   Declaration Of Stephan Goss             72

14   Exhibit 5   Declaration Of Fernando Borghese        86

15   Exhibit 7   Responses To Digital Media              86
                 Solutions, LLC's Requests For
16               Admission To ZeetoGroup, LLC,
                 Set One
17
     Exhibit 8   Responses To Digital Media              87
18               Solutions, LLC's Special
                 Interrogatories To ZeetoGroup, LLC,
19               Set One

20   Exhibit 9   Responses To Digital Media              87
                 Solutions, LLC's Requests For
21               Production Of Documents To
                 ZeetoGroup, LLC, Set One
22

23

24

25
```

Deposition of STEPHAN GOSS                    DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC

1          DEPOSITION OF STEPHAN GOSS

2

3          BE IT REMEMBERED, that pursuant to

4    Notice, and on the 24th day of July, 2023,

5    commencing at the hour of 10:08 a.m., before me,

6    CYNTHIA ORNELAS, a Certified Shorthand Reporter for

7    the State of California, appeared STEPHAN GOSS, via

8    videoconference, produced as a witness in said

9    action, and being by me first duly sworn, was

10   thereupon examined as a witness in said cause.

11

12                    ---oOo---

13   REMOTE APPEARANCES:

14   For The Plaintiff:

15          MARK ELLIS/LAWRENCE IGLESIAS
            Ellis Law Group
16          1425 River Park Drive, Suite 400
            Sacramento, CA 95815
17          mellis@ellislawgrp.com

18   For The Defendant:

19          JACOB GILLICK
            PHG Law Group
20          501 W. Broadway, Suite 1480
            San Diego, CA 92101
21          jgillick@phglawgroup.com

22

     Also Present:
23
            Doug Olson, Videographer
24

25

Deposition of STEPHAN GOSS    DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | --- oOo --- |
| 3 | THE VIDEOGRAPHER:  The date is July 24th, |
| 4 | 2023.  The time is 10:08. |
| 00:00   5 | My name is Doug Olson.  I am with Golden |
| 6 | State Reporting & Video, and I will be video |
| 7 | recording today's legal proceedings.  I am |
| 8 | appearing as an impartial videographer to video |
| 9 | record today's proceedings. |
| 00:00  10 | The participants are appearing remotely |
| 11 | being this is a videoconference deposition. |
| 12 | We are here in the matter of Digital Media |
| 13 | Solutions, LLC versus ZeetoGroup, LLC, Case No. |
| 14 | 22CV01184 JLS-AHG.  This is the video recorded |
| 00:00  15 | deposition of Stephan Goss.  The noticing attorney |
| 16 | is Mark Ellis with the law offices of Ellis Law |
| 17 | Group, LLP.  The deposition officer is Cindy |
| 18 | Ornelas. |
| 19 | Please try to avoid any cross-talk when |
| 00:01  20 | speaking so as to create an accurate record. |
| 21 | Please take note that video and audio latency |
| 22 | issues may occur due to participants' bandwidth and |
| 23 | webcam performance. |
| 24 | Beginning with the noticing attorney, will |
| 00:01  25 | all counsel state their name and who they represent |

| | | |
|---|---|---|
| | 1 | for the record. |
| | 2 | MR. ELLIS:  Good morning everybody.  My |
| | 3 | name is Mark Ellis, and along with me is Larry |
| | 4 | Iglesias even though he's off camera.  We're with |
| 00:01 | 5 | the law of firm Ellis Law Group, LLP.  And I |
| | 6 | represent the plaintiff in this matter, Digital |
| | 7 | Media Solutions, which I will be probably using the |
| | 8 | acronym DMS from here on out. |
| | 9 | MR. GILLICK:  Good morning.  Jack Gillick |
| 00:01 | 10 | from PHG Law Group representing Zeeto. |
| | 11 | THE VIDEOGRAPHER:  If there are no further |
| | 12 | appearances to put on the record, the court |
| | 13 | reporter may swear in the witness. |
| | 14 | STEPHAN GOSS, |
| | 15 | sworn as a witness, |
| | 16 | testified as follows: |
| | 17 | EXAMINATION BY MR. ELLIS: |
| | 18 | Q.  Good morning, Mr. Goss.  Is it Goss?  It's |
| | 19 | not Goss, it's Goss? |
| 00:02 | 20 | A.  Goss, yes. |
| | 21 | Q.  Can you state your name and spell your |
| | 22 | full name for the record, please? |
| | 23 | A.  Sure.  My name is Stephan Goss, |
| | 24 | S-t-e-p-h-a-n, and last name is G-o-s-s, S as in |
| 00:02 | 25 | Sam, S as in Sam. |

Deposition of STEPHAN GOSS          DIGITAL MEDIA SOLUTIONS, LLC VS  ZEETOGROUP, LLC

```
 1    BY MR. ELLIS:
 2        Q.  That's not one of those ones I'll comment
 3    about.
 4            It was, it looks like there was some
 5    communications between you and one of the people
 6    that works for you.  I've got his name here some
 7    place.  Looked like in June and July and August
 8    your tracking indicated that there were, I'm going
 9    to use the term you use, which I hate, open quote,
10    "fraudulent," close quote, hits, which I guess
11    caused some concern at Zeeto.  Do you remember that
12    happening?
13        A.  I do, yes.
14        Q.  During the campaign that was being run for
15    DMS at that point in time or campaigns, were
16    advertisers paying for mere hits on the platform?
17        A.  They were not, no.
18        Q.  The advertisers at issue in that campaign
19    were only paying if they actually got a lead?
20        A.  It would have been either a lead or a
21    click.  But yes, I think where you're going makes
22    sense, yes.
23        Q.  Let's just explain again right now because
24    I'm not sure I understand it.  What is the
25    difference between a click and a lead and actually
```

00:26    5
00:26   10
00:27   15
00:27   20
00:27   25

1    getting a customer?

2         A.   Fair point.  So there's two different

3    types of advertiser campaigns.  Broadly speaking

4    there's two types.  One is literally just showing

00:27    5    them an ad.  And on that ad, if the user clicks on

6    it, they will then go to that advertiser's website.

7    So that's either on a CPC, cost per click, or a

8    CPA, cost per action.  Which would mean if the user

9    goes to that website and then generally speaking

00:28    10    signs up for that website, that would be considered

11    what we would get paid for.  So that's a link-out

12    advertising campaign.

13         And then there's the second type, which is

14    what we call a simple opt-in campaign, in which

00:28    15    case the ads shown the user would not be an image

16    ad.  It would probably more like, for example, I'll

17    go back to the car insurance case.  If the question

18    was, "Are you looking for car insurance?"  And the

19    user clicked "Yes," then there will be an ad that

00:28    20    says, "Are you interested in a call from Geico?"

21    And there will be a "Yes" button and a "No" button.

22    If the user clicks the "No" button, then meaning

23    they are not interested, that means effectively

24    nothing would happen.  It would move on to the next

00:29    25    question, and that user's lead would not be sold

```
1   because they did not consent to having their lead

2   sold.

3           On the other hand, if they click "Yes,"

4   then their first name, last name, sometimes e-mail

5   address and phone number would be sent to Geico.

6   Geico would have effectively purchased that lead

7   because the user had consented to get a call from

8   Geico, in which case sending them the lead would be

9   what is considered the billable action.  And in

10  that case there would be no going on to another

11  website.  That would have been the billable action.

12  That would be a CPL, cost per lead.

13      Q.  That's the value that you're providing,

14  which is the real connection to get this third

15  party connected with one of your advertisers?

16      A.  That's correct, yes.

17      Q.  Whether or not the lead purchases

18  insurance, you don't get paid for that.  You get

19  paid simply for the connection, getting them I

20  guess electronically connected?

21      A.  That is kind of a yes and no.  Yes, you're

22  technically correct from an accounting perspective,

23  but from an actual what realistically happens, if

24  we send many leads to an advertiser and they do not

25  perform well, then they will stop paying us.  They
```

1  to actually test with us.  So we do it for free.

2  We have no minimum terms or anything, and it just

3  makes the sale cycle much quicker and much simpler,

4  and it makes both advertisers and publishers

00:34  5  happier, and we end up making more money in the

6  long run.

7      Q.  I don't want to know any details in

8  particular, but has it ever worked out that you've

9  had to sue an advertiser that has refused to pay

00:34  10  after they have used your services?

11     A.  Yes.

12     Q.  Did you have to sue any of the advertisers

13  that were connected with the DMS campaign because

14  they were dissatisfied with the results that they

00:35  15  were getting from the DMS campaign?

16     A.  By the time the fraud, or we can call it

17  bad traffic because I think you probably prefer

18  that.  We can draw the distinction between fraud

19  and bad traffic at some other point.

00:35  20          The percentage of bad traffic spiked,

21  so -- and this is to my best of my recollection, so

22  this might be slightly off just date, timeline

23  wise.  But so DMS told us that they were going to

24  be leaving to start using their own platform, at

00:35  25  which point, I forgot the exact timeline of this.

1    There might have been some overlap of the increase

2    in bad traffic coming in to the Zeeto platform.

3    And what ended up happening is that Zeeto, we

4    stopped sending or running our advertisers'

00:35    5    campaigns on DMS's property.  So the most of the

6    bad traffic did not, in fact, go to advertisers

7    that paid Zeeto, it would have gone to advertisers

8    that would have directly paid DMS.

9        Q.  I see.

00:36    10        A.  So to answer your question, no.  If there

11    had been an issue of nonpayment, it would have been

12    DMS to have to sue their own advertisers.  It would

13    have not been Zeeto suing our advertisers.

14        Q.  All right.

00:36    15            We've been going about 45 minutes.  I'm

16    going to stop real quick because I'm a man of a

17    certain age, and I have to use the restroom.  We'll

18    come back in about five minutes, okay?

19        A.  Sounds good.

00:36    20            THE VIDEOGRAPHER:  We're going off the

21    record.  The time is 10:45.

22            (Recess taken from 10:45 to 10:54 a.m.)

23            THE VIDEOGRAPHER:  We are back on the

24    record.  The time is 10:54.

25

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | BY MR. ELLIS:                                            |
|       | 2  |     Q.  Welcome back, Mr. Goss.  The contract in        |
|       | 3  | question, I guess you don't have that sitting in         |
|       | 4  | front of you for some reason, do you?                    |
| 00:46 | 5  |     A.  I can probably pull it up.                       |
|       | 6  |     Q.  If you could do that.                            |
|       | 7  |     A.  It is Exhibit 1, right?  That's the one          |
|       | 8  | you want to look at?                                      |
|       | 9  |     Q.  That's correct.                                  |
| 00:46 | 10 |     A.  I have it open.                                  |
|       | 11 |         (Plaintiff's Exhibit No. 1 was marked for        |
|       | 12 |         Identification)                                  |
|       | 13 | BY MR. ELLIS:                                            |
|       | 14 |     Q.  It looks like your signature was                 |
| 00:46 | 15 | electronically put on this.  I'm looking at the          |
|       | 16 | last page.  Looks like it's dated August 23rd,           |
|       | 17 | 2018; do you see that?                                    |
|       | 18 |     A.  Correct.  That is my signature.  Yes.           |
|       | 19 |     Q.  So let me just ask you, was this a               |
| 00:47 | 20 | standard contract in 2018 that Zeeto used?              |
|       | 21 |     A.  It was our contract, our standard one.  I       |
|       | 22 | am not able to either recall if there were red          |
|       | 23 | lines, nor would I know if there were from reading      |
|       | 24 | it.  But it is the standard starting contract, and      |
| 00:47 | 25 | there might or might not have been edits, I'm not        |

1    sure.

2        Q.   Who created this standard contract?  Did

3    you have a legal team put this together?

4        A.   Yes, but I do not recall which one.

00:47    5        Q.   I don't need --

6        A.   But yes, it was lawyers.

7        Q.   Okay.  So the standard contract would have

8    had generally the same terms which could be

9    modifiable perhaps?

00:48   10        A.   Correct.  We do red lines on occasion.

11        Q.   Do you remember if there were any red

12    lines on the DMS contract, this contract?

13        A.   I do not recall, no.

14        Q.   This is the contract that is attached to

00:48   15    your Declaration, which we're also going to be

16    looking at.  Do you remember preparing or working

17    with Jake to get your Declaration prepared?  It

18    would have been last fall of 2022.

19        A.   No.  I do not recall.

00:48   20        Q.   You said that you've had your deposition

21    taken multiple times.  Is Zeeto currently in any

22    litigation other than the litigation with DMS?

23        A.   I believe the answer is yes.  Jake would

24    honestly know better than I would.  We have the

00:49   25    occasional like TCPA dispute.  That's probably the

1    Q.  Here we go.  It's at Page 2 of Exhibit 1,

2    paragraph 3e.  And it reads, "Damages.  If Zeeto

3    determines that publisher has violated any portion

4    of this Section 3, Zeeto may withhold payment owed

00:58  5    by publisher."  And it goes on to say,

6    "Furthermore, if publisher violates Section 3,"

7    subdivision "(d), publisher agrees to pay an amount

8    equal to $100,000 in liquidated damages."

9         And Mr. Goss, did I read that portion

00:58  10   correctly?

11   A.  Yes.

12   Q.  Who came up with the $100,000 liquidated

13   damages concept?

14       MR. GILLICK:  Calls for speculation.

00:59  15       THE WITNESS:  Zeeto did.  I don't recall

16   the person.

17   BY MR. ELLIS:

18   Q.  Did you participate in that?

19   A.  This would have been years and years ago.

00:59  20   I do not recall.

21   Q.  Has Zeeto ever, to your knowledge,

22   implemented $100,000 liquidated damage with any

23   other customer other than DMS?

24   A.  DMS was the largest and only meaningful

00:59  25   publisher that Zeeto has had at the time of this

1    agreement, so there would have been no one to enact

2    that with except for DMS, so the answer is no.

3        Q.  Has, to your knowledge, has Zeeto

4    threatened any other publisher and/or advertiser

01:00    5    with liquidated damages?

6        A.  The agreement would not apply to

7    advertisers, so that would not apply.  Other

8    publishers, no, I don't think that's been the case.

9    We didn't really have many publishers at the time,

01:00    10    and even now we are scaling a few selective ones,

11    though we have not had this issue since then again.

12        Q.  So is Zeeto doing any work at this point

13    in time with DMS or running any campaigns with DMS

14    at this point in time or has all the work ceased?

01:00    15        A.  No.  All the work ceased.

16        Q.  There is an indemnity provision in this

17    agreement also.  There it is.  In paragraph 8.

18    What page is it on?

19            MR. IGLESIAS:  Page 3.

01:01    20    BY MR. ELLIS:

21        Q.  In paragraph 8, "Indemnity."  And it says,

22    "You agree to indemnify and defend Zeeto, its

23    affiliates, subsidiaries, agents, advertisers,

24    employees and officers from and against any and all

01:01    25    third party losses, liabilities, claims, damages,

|  |  |
|---|---|
| 1 | happened. |
| 2 | Now, the publisher could do uncompliant |
| 3 | things before or after using the Zeeto platform, |
| 4 | right. So frequently there's really no way to tell |
| 01:12 5 | what would have originated the lawsuit in that |
| 6 | case. There is a way for publishers to do |
| 7 | uncompliant things outside of using Zeeto. And |
| 8 | then obviously there's the is it real traffic |
| 9 | question, to which we use a third-party tool called |
| 01:13 10 | Anura, which I'm sure we're going to talk about. |
| 11 | And then despite that, we do a lot of internal |
| 12 | double checking. That's more of like a monthly |
| 13 | type situation though, so that's less frequent |
| 14 | because it is quite labor intensive, and it's |
| 01:13 15 | sometimes difficult to catch issues. |
| 16 | Q. Let me finish up on this Paragraph 8 in |
| 17 | Exhibit 1 entitled "Indemnity." And that's this |
| 18 | last subsection (d). Again, this is going back and |
| 19 | saying you will indemnify and defend Zeeto for, |
| 01:13 20 | "your use of the services." What does that mean, |
| 21 | if you know? |
| 22 | A. I don't know the exact distinction between |
| 23 | the platform. I'm guessing it means the use of the |
| 24 | service of using the platform. |
| 01:14 25 | Q. All right. Let's scroll back up and go to |

```
 1    Section 3.  You knew this was coming, right?
 2        A.  I figure we're going to go there at some
 3    point.
 4        Q.  We're going to go back down to 3d.  So
 5    Section 3d reads as follows:  "Deceptive Practices.
 6    Zeeto reserves the right to terminate this
 7    agreement and investigate publisher for deceptive
 8    practices at its sole discretion. 'Deceptive
 9    Practices' for the purposes of this agreement
10    include, but are not limited to, the following:"
11    Subdivision i.  Roman Numeral i.  "Using fake
12    redirects."
13            Let me just stop you right there.  What's
14    a fake redirect?
15        A.  So a fake redirect is if, for example, you
16    went to the New York Times, and somebody had
17    installed malware on your computer, and that would
18    "fake," quote, unquote, redirect you to a different
19    site except for the New York Times.  That would be
20    what's considered a fake redirect, which is just
21    effectively a fraudulent tactic of getting free web
22    traffic.
23        Q.  Based upon your personal knowledge, did
24    DMS send any fake redirects?
25        A.  I have no direct way of saying which kind
```

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | of methods were used in the traffic that we flagged    |
|       | 2  | as fraud.  It seems unlikely to me just because        |
|       | 3  | that's a relatively old-school method, so I would      |
|       | 4  | say probably not.                                      |
| 01:16 | 5  | Q.  Next is using automated software.  What            |
|       | 6  | does that mean?                                        |
|       | 7  | A.  Generally automated software, it's               |
|       | 8  | obviously a very broad term.  In this context what     |
|       | 9  | it is most likely to mean is some sort of a script     |
| 01:16 | 10 | or a program that will add automatically sign up       |
|       | 11 | for a website and enter either completely fake data    |
|       | 12 | or real data of real people that it effectively        |
|       | 13 | imitates, but not, that aren't the people, so where    |
|       | 14 | it effectively pretends to be someone else, and you    |
| 01:16 | 15 | would just use a script to do that at scale for        |
|       | 16 | free.                                                  |
|       | 17 | Q.  Do you have any personal knowledge as you        |
|       | 18 | sit here today that DMS utilized automated software    |
|       | 19 | in conjunction with using the Zeeto platform?          |
| 01:17 | 20 | A.  Do you mind if I expand a little bit?             |
|       | 21 | Q.  Sure.  No.  Go ahead.                             |
|       | 22 | A.  So we have no direct knowledge of how the        |
|       | 23 | fake traffic came to ZAN.  So it was never             |
|       | 24 | disclosed to us who the affiliate, like where the      |
| 01:17 | 25 | traffic was coming from.  It was never disclosed to    |

```
 1   us by DMS.  I believe we asked several times.  So

 2   we do not know if even DMS would know what methods

 3   were used to generate the fake traffic.  It is

 4   entirely possible that DMS did not know the

 5   methods.

 6            From our investigation, it is most likely

 7   that it was a third-party affiliate that they were

 8   buying traffic from that they knowingly were

 9   purchasing bad traffic and scaled it up because it

10   was very profitable.

11            So I have no direct knowledge.  I would

12   say automated software would I would say 95 percent

13   chance or more have been used to do it just from

14   that's how these scams usually work.  So most

15   likely I would say automated software would have

16   been the way that it would have been used, yes, but

17   I have no direct knowledge, and it is pure

18   speculation.

19       Q.  Is that the same thing -- I've heard the

20   term bots.  I guess that's an abbreviation for

21   robot or automated software.  I've heard it, for

22   example, someone, tickets go on sale for a concert,

23   and the lines get all tied up because there are

24   programs that are being used to buy blocks of

25   tickets.
```

```
 1              Is this the same concept or am I

 2     completely in left field?

 3         A.  Yeah, no.  That's exactly the same

 4     concept.  Really just like you would for like if

 5     you were trying to buy a ticket using a bot, what

 6     you would program the bot/automated

 7     software/computer program to do is to basically say

 8     when this ticket come on sale, click this button,

 9     type in this first name, this last name and this

10     credit card, and then hit submit.

11              With a ticket you would obviously want to

12     then own it, so you would use real data.  In the

13     scenario that we're talking about, what would be

14     happening is that -- so DMS gets paid if a lead is

15     submitted, correct.  So Zeeto would intermediate

16     through a platform.  So what ends up happening is

17     that people will send -- and when we say traffic,

18     we mean web traffic of consumers coming to the

19     website.

20              So usually when we buy ads, the idea is

21     you buy an ad, people will come to your website,

22     sign up, see ads, click yes and generate revenue.

23              The problem in our industry is that the

24     other way to do that whole process is by using a

25     bot or automated software to do that whole process
```

1    using fake, either fake data or real data of

2    somebody that you're impersonating effectively.

3    And because when you click submit, the advertiser

4    cannot tell if it's real or if it's fake.  So that

01:20    5    whole process can effectively be circumvented

6    through automated software or a bot.

7        And that's again where I was talking

8    earlier about how that can be a TCPA violation,

9    this is why.  If you're using real, you're just

01:20    10    effectively impersonating consent.

11        Again, it could have been a third party

12    doing that.  I would be surprised if DMS had done

13    that themselves, but it could also have been DMS

14    themselves I guess.  I do not have any direct

01:20    15    knowledge of who it was.

16        Q.  You don't know one way or the other?

17        A.  Yes.  Correct.  I do not.

18        Q.  Your suspicion it was not DMS, but you

19    couldn't say definitively.  Am I getting your

01:21    20    answer pretty much correct?

21        A.  My suspicion is that DMS was not the one

22    doing it.  My suspicion is that DMS knew what was

23    happening and knew it was fake traffic, and

24    knowingly bought it because the margins of fake

01:21    25    traffic are extremely attractive because it's fake

1    traffic, right, so they just want to get paid.  So

2    it's extremely profitable for DMS to purchase it.

3    Maybe, whatever, they would spend 10 cents and they

4    would make a dollar, right.  So that is correct.

01:21    5          But again, I speculate.  I do not have

6    any -- I have no -- I haven't seen communications

7    with the affiliate or any of that yet.  But that's,

8    again, having been in the industry for 12 years,

9    that's generally how this ends up happening.

01:21    10     Q.  You just used a new term, "affiliate."  Is

11   affiliate the same as an advertiser?

12     A.  It is not.  That's a great question.  So

13   perfect.  It's a third party.

14          Publishers will generally buy web traffic.

01:22    15   They will do so through, for example, going on

16   Facebook and placing ads.  And sometimes they will

17   hire other third parties, which we call affiliates,

18   to do that whole process for them.  So they will

19   hire affiliates to send traffic to their websites,

01:22    20   and that traffic would then be monetized by Zeeto.

21          Generally speaking, publishers pay

22   affiliates only when revenue is generated inside of

23   Zeeto's platform.  So affiliates also have an

24   incentive to send fake traffic because they get

01:22    25   paid for doing that whole process.

1    Q.   Do you recall whether there were any

2  affiliates that were participating with Zeeto and

3  DMS in the campaigns they were running in the

4  summer of 2020?

01:23    5    A.   I remember there were several instances

6  where Zeeto detected fraudulent traffic in

7  conjunction with DMS.  So we would get together and

8  say hey, this source seems like fraudulent traffic.

9  You have to pause it.  Because again, we have a

01:23   10  total, like we do not want any fraudulent traffic

11  through our platform policy.  So we communicated

12  with DMS, they would effectively pause it.

13       And so actually also at the same token,

14  when DMS detected fraudulent affiliates, they would

01:23   15  also not pay them for their traffic and they would

16  have not paid in full.  So they would not have paid

17  even partial for what was considered real traffic.

18  They would not have paid for the entire amount.

19       It's very much industry standard practice

01:23   20  that if fraud at a meaningful level is detected

21  that the entire bill is void.  So that, I think DMS

22  did that on several occasions to some of their

23  affiliates.

24    Q.   What is the industry practice for a

01:24   25  meaningful level?  We attorneys, or if you're an

1    levels -- now if somebody is consistently at like

2    80 percent bad, then of course that is just

3    obviously bad traffic.  We would just cut that

4    immediately and they would not get paid because

01:25    5    they were probably doing that on purpose.  If

6    somebody is consistently at three percent, and then

7    there's a substantial spike, that generally

8    indicates that there's more of somebody on purpose

9    started doing more fraud because again, more fraud

01:25    10    is more profitable both for the publisher and for

11    the affiliate.

12         So there's occasions where some affiliates

13    will not do any, and then suddenly they will start.

14    So we use Anura as a detection tool.  It's really

01:26    15    more of the spike I would say that's indicative

16    than just the exact level.  So if somebody is

17    consistently at whatever, eight percent, and we for

18    example know, yes, it's traffic from an ad network

19    that has a higher, and it could be either false

01:26    20    positive, and sometimes it's not even that, it's

21    just actually sometimes it's just bad.

22         But generally there's a game theory

23    explanation, right, like if no one makes money off

24    the fraud, then it's not generally, because then no

01:26    25    one actually signs up, and no one does fake

```
 1        A.   Yes.   Correct.   That's why, for example,

 2    we have Anura much later in our funnel.   So we

 3    don't run Anura everywhere.   We really focus our

 4    analysis on the later in the funnel.   So any time

 5    we look Anura stats, we look at the later down the

 6    road so we avoid those type of false positives.

 7             Because again, we are trying in all of

 8    these scenarios, our first assumption is always

 9    that the publisher did not do it on purpose and

10    that they were also tricked by the affiliate,

11    right, because that happens frequently.

12             Finding affiliates, sometimes they are

13    just bad, sometimes they are fraudulent, and we

14    absolutely collaborate with our publishers to find

15    that and to cut that off as soon as we possibly

16    can.   There's usually a collaboration that happens

17    multiple times with DMS.   And in that scenario it

18    does not lead to Zeeto nonpayment.   We nonpay when

19    we feel that the publisher purposefully did that or

20    at least endorsed it.   So it's a much more extreme

21    measure, and we do not apply that all the time.

22    That's why also it is at our discretion to do so.

23        Q.   To finish up on this d little Roman

24    Numeral i, to get where I'm at now, it says,

25    "Deceptive Practices for the purposes of agreement
```

1    include, but are not limited to the following:

2    Using fake redirects."  We discussed that.  Using

3    "automated software."  We just discussed that.  And

4    then it says, "fraud, or acting in any way to

01:29   5    generate false clicks or leads ("Click Fraud");"

6           So have we already covered what is fraud

7    or acting in any way to generate false clicks or

8    leads?  I think your last two answers have kind of

9    like picked all of that up.

01:30   10        A.   Yeah.  These are somewhat redundant

11    points.  So I think generating false clicks or lead

12    is generally done using automated software, so it

13    would be like very much the same thing.

14        Q.   You've explicated for me, and thank you

01:30   15    very much, it's helpful.  There seems again to be a

16    difference between a false click or a nonproductive

17    click and a false lead or a nonproductive lead,

18    with the lead being somewhere further down the

19    process in part, and also I guess importantly, it's

01:30   20    when it looks like it's a lead, that's when it

21    triggers some sort of payment.  Am I right about

22    that or wrong about that?

23        A.   You're right.  And I think one of the key

24    things to point out there is the incentives, right.

01:31   25    So there's lots of click fraud and other kinds of

|  |  |  |
|---|---|---|
|  | 1 | generating like revenue that you're not deservant |
|  | 2 | of on the Internet. |
|  | 3 | So for example, what happens frequently, |
|  | 4 | let's say you're buying ads from let's say Google |
| 01:31 | 5 | is a good example, and I won't go into why, but |
|  | 6 | let's just say it is.  So if you're buying ads from |
|  | 7 | Google, what Google does is it puts your ad very |
|  | 8 | much like Zeeto does on to third-party publishers' |
|  | 9 | websites. |
| 01:31 | 10 | So in that scenario, if, for example, DMS |
|  | 11 | were to buy ads from Google, somebody else would |
|  | 12 | have in turn had an incentive to defraud Google and |
|  | 13 | in turn to defraud DMS by having a fake click on |
|  | 14 | that website that DMS bought the click from, right. |
| 01:31 | 15 | So in that scenario most likely that automated |
|  | 16 | software would stop from progressing after they had |
|  | 17 | hit DMS's site because they have already defrauded |
|  | 18 | the people they want to defraud, which in that case |
|  | 19 | was Google, right.  So in that scenario, it is very |
| 01:32 | 20 | unlikely that that would have progressed further. |
|  | 21 | But if there's bot traffic that continues |
|  | 22 | down the funnel, then it is much more likely to be |
|  | 23 | done either by DMS or one of DMS's affiliates |
|  | 24 | because Zeeto pays on a revenue per lead, as you |
| 01:32 | 25 | were saying, right.  So their incentive is to make |

1  it all the way from the beginning and then generate

2  one or multiple leads or clicks on a third-party

3  advertiser's ad.

4      Q.  How long had, when this dispute started

01:32  5  between Zeeto and DMS in the late summer, fall of

6  2020, how long had Zeeto been working with DMS?

7      A.  It must have been quite a few years.

8  Probably three to five years would be my high-level

9  guess because at 2018 we signed the publisher

01:33  10  agreement, but we had already been working with DMS

11  for several years before that.  So the start of the

12  publisher agreement was not the start of the

13  relationship.

14      Q.  Had you had problems before with DMS?

01:33  15  From what I've heard from the folks internally at

16  DMS is that they liked you.  They had a good

17  working relationship they thought with Zeeto.  Did

18  you feel the same way going back the other way?

19      A.  Well, we did until they terminated the

01:33  20  contract and cut us out and decided to do it

21  without us.  So this happened after DMS terminated

22  effectively.  So we did until they decided to be

23  more profitable to do it themselves and cut us out.

24      Q.  That sounds retaliatory.  I'm just

01:34  25  kidding.  Is that when it did break down though

```
 1   when Zeeto had made a decision that they wanted to,

 2   I don't know, I guess take a good idea from Zeeto

 3   and do it themselves?

 4       A.  DMS made the decision.  And by the way,

 5   this was perfectly within their contractual rights.

 6   There was no long-term contracts in place.  I'm a

 7   little grumpy about it, but I did not feel like

 8   that was in any way anything that they were weren't

 9   supposed to do.

10       Q.  To be fair, you've now gone out and

11   created your own publishing, publisher company,

12   which is -- right?

13       A.  We had one before.  We had one before as

14   well.  But yes, you're correct.  We're now in a

15   very similar space that DMS has decided to leave

16   with us.  That's correct.

17       Q.  I want to go back because I promised you

18   that I'm going to be done in less than four hours.

19   I want to go back to Exhibit 1, paragraph 3d.  I'm

20   looking at now paragraph 3d, little Roman Numeral

21   ii where it says, "Generating multiple leads using

22   proxy services."

23           Do you have any facts that would tend to

24   support the spike of what happened in the summer of

25   2020 was by DMS doing this?
```

1    A.  Generally speaking, when you use automated

2    software, you would also use proxy servers.  So

3    assuming it was automated software, then it would

4    likely also have used proxy servers and the

01:35    5    multiple leads generating.  So -- sorry.  To

6    generate multiple leads, you use proxy servers to

7    obfuscate that you are generating multiple leads.

8            So yes, generally speaking -- and again, I

9    still do not know how it was done, so this is again

01:36    10    the speculative part.  I would speculate that if it

11    was using automated software, proxy servers would

12    have also been used to generate multiple leads.

13    Q.  By whoever was doing it, because again,

14    whether DMS was being duped in the same way that

01:36    15    Zeeto was and the advertisers were purportedly

16    being duped, you just don't know as you sit here

17    today?

18    A.  That's correct, yes.

19    Q.  Number iii, "Using iFrames"?

01:36    20    A.  Correct.

21    Q.  "Hidden frames or redirects."  Do you have

22    any facts to indicate that DMS was doing any of

23    that?

24    A.  Again, I'm speculating.  I would speculate

01:37    25    no, these would not be used.

1    Q.   Then finally, d iv.  "Any method in which

2    you use the Zeeto platform in attempt to increase

3    your revenue in a dishonest or deceitful way that

4    harms the quality of the Zeeto platform and its

5    users."

6            As you sit here today, Mr. Goss, do you

7    have any fact, any fact as opposed to just a belief

8    that DMS was doing this?

9    A.   I want to clarify one thing.  We have

10   many, many facts as to the traffic was like bad

11   traffic.  We cannot from those facts determine how

12   the bad traffic was generated.

13           So to answer your question, yes, number iv

14   is redundant as well as with number i and number

15   ii.  So again, this is the speculation of how it

16   was done.  So I don't have any facts on how exactly

17   it was done.  If automated software was used or

18   generating multiple leads using proxy servers, then

19   number iv would have by default also been violated

20   since that's the dishonest or deceitful ways that

21   harm quality of the platform and its users.  So

22   yes, it would fall in line with number i and

23   number ii.

24           MR. ELLIS:  Let's go off the record for a

25   second.

1  together and said this is the standard.  So there's

2  no -- and it would vastly depend on what you're

3  doing anyway.  I don't think there's anything as

4  clear as an industry standard.

01:57    5  I think it is an industry standard

6  practice that when fraud is detected, then there's

7  no payment.  I believe that was more my comment

8  earlier.  Not so much that there's an industry

9  standard like percentage.  It's more of the what

01:58   10  happens when it spikes.

11  Q.  Right here, and again, this is from

12  Mr. Borghese to you, says, "These traffic sources

13  represent less than 11 percent of our total media

14  mix, and they've been a" constant "part of our

01:58   15  media mix, with no issues risen outside of normal

16  course of business."  Do you see that?

17  A.  I do see that, yes.

18  Q.  You've been doing business with DMS under

19  this contract 2018.  So I think that contract was

01:59   20  started in August of 2018.  So 2018 for the rest of

21  the year no problem, correct?

22  A.  I don't know.  I'm sure there were

23  incidents along the way that we resolved together.

24  Q.  You mean where there might have been --

01:59   25  again, I don't like the term fraudulent because it

Deposition of STEPHAN GOSS                    DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC

|  | | |
|---|---|---|
| 01:59 | 1 | connotes to me an intent where if you have a bad |
| | 2 | affiliate that is doing this, and you have no idea. |
| | 3 | I get it that you get a bad hit, and I understand |
| | 4 | why you would be concerned, but to me as an |
| | 5 | attorney, that's a distinction with a difference. |
| | 6 | A.  I agree.  We make that same distinction on |
| | 7 | our side. |
| | 8 | Q.  Okay.  So there may have been problems, |
| | 9 | but Zeeto on its part and DMS on its part would |
| 02:00 | 10 | work to resolve those issues? |
| | 11 | A.  Correct. |
| | 12 | Q.  And you would still pay DMS I take it? |
| | 13 | A.  That's correct, yes. |
| | 14 | Q.  And again, that same thing in 2019 I take |
| 02:00 | 15 | it? |
| | 16 | A.  Correct. |
| | 17 | Q.  The same thing in 2020 I take it? |
| | 18 | A.  Correct. |
| | 19 | Q.  Then it was this spike in 2021 where there |
| 02:00 | 20 | was really kind of a breakdown; is that fair? |
| | 21 | A.  Yes. |
| | 22 | MR. ELLIS:  Let's move on to No. 3. |
| | 23 | (Plaintiff's Exhibit No. 3 was marked for |
| | 24 | Identification) |
| 02:00 | 25 | |

Golden State Reporting & Video Services (866) 324-4727                    **Page: 71**

1    Q.  But the fact is is that you have not been

2    confronted by one single advertiser that has

3    complained about that purported spike in hits from

4    the summer of 2021, have you?

02:07    5    A.  That's not the only metric by which this

6    would be judged, but you are correct.

7    Q.  Right.  But it's the one metric I'm asking

8    the question about, and that is true, correct?

9    A.  That is true then, yes.

02:07    10    Q.  Are you aware, has anyone told you that

11    Zeeto's reputation in this third party's mind has

12    somehow been sullied?

13    A.  Certainly the consumer who is doing one of

14    our or one of the advertisers in the platform.  So

02:07    15    yes, absolutely.  Any consumer who had fake

16    information entered potentially through this would

17    absolutely feel that our reputation has been

18    damaged because, I mean, clearly they now hate us

19    because it was fake.

02:07    20        I think there's the whole extra component

21    of many people understand how our paths look,

22    though simply because they didn't complain to us,

23    if there was fake traffic going through the

24    platform, they would absolutely be able to connect

02:08    25    that even if it was done purely by DMS and its own

1    advertisers.  So even if the advertisers didn't

2    complain to us, other people would know about it.

3    And several people have commented on this lawsuit

4    already.  So yes, several people have, in fact,

02:08    5    directly commented on this issue.

6        Q.  Who has directly commented to you about

7    this lawsuit?  Give me a name.

8        A.  I think, I forgot the guy's name.  Several

9    people reached out.  I can ask Shayne Cardwell.  I

02:08    10    believe several people asked him about it.

11        Q.  Not trying to cut you off, Mr. Goss.

12    That's what we call hearsay.  And when someone is

13    talking about Shayne, that's what we call double

14    hearsay.

02:08    15        So let me just ask, give me one name as

16    you sit here today.  You've known that this

17    deposition was going to occur for months.  Give me

18    one name of someone that says that Zeeto's

19    representation has been sullied.  I don't think you

02:09    20    can.  I'm saying it with a smile on my face, but I

21    don't think you can, can you?

22        A.  On the hearsay part, Mr. Cardwell told me

23    that several people have asked him about it.  I

24    believe that's not hearsay because I'm not

02:09    25    commenting on what they said.  I'm simply saying

|  |  |  |
|---|---|---|
|  | 1 | that Mr. Cardwell told me that several people have |
|  | 2 | commented and that any fraudulent anything is |
|  | 3 | always bad for us, right.  We try to stand out in |
|  | 4 | the industry of not having these things happen, and |
| 02:09 | 5 | I believe Mr. Chris McKibbin got questions as well. |
|  | 6 | A lot of these are conferences like |
|  | 7 | affiliate summit, et cetera.  I do not go to those |
|  | 8 | conferences.  No one contacted me directly about |
|  | 9 | them, so I don't know the details beyond what two |
| 02:10 | 10 | direct employees have told me about those |
|  | 11 | conversations. |
|  | 12 | Q.  Fair enough.  What they have told you |
|  | 13 | about the conversation is that someone has |
|  | 14 | commented on the DMS lawsuit? |
| 02:10 | 15 | A.  They were commenting, they got several |
|  | 16 | questions about it.  And I believe -- the problem |
|  | 17 | with these things is, right, when there's any |
|  | 18 | traffic running, any fraudulent traffic running |
|  | 19 | through our platform, even if it doesn't get to a |
| 02:10 | 20 | specific advertiser, everyone immediately gets |
|  | 21 | concerned that they are the ones getting the fake |
|  | 22 | traffic. |
|  | 23 | So if they got the traffic or not is not |
|  | 24 | necessarily indicative of if they were concerned |
| 02:10 | 25 | about it.  If it damaged our reputation for really |

1    good quality and if they pulled back budgets or

2    dollar spent.  It's very difficult to exactly have

3    a correlation or quantification on this obviously,

4    but that's why we are so ardent about fighting any

02:10  5    rumors, any acts of fraud or fraudulent traffic in

6    our platform.

7        Q.  I'm concerned about facts.  Again, the

8    subpoena that you've received, what the facts are

9    of that lawsuit and what generated that lawsuit you

02:11  10    just don't know, correct?

11        A.  Correct.  I don't know the details of it.

12        Q.  So with respect to you have no information

13    as you sit here today that you have, when I say

14    you, Zeeto, has lost any advertising revenue

02:11  15    because of this campaign that DMS was running in

16    the summer of 2021; isn't that true?

17        A.  Well, we build a brand that is very

18    heavily built on not having false traffic run

19    through our platform.  So if people think that

02:11  20    false traffic or fake traffic is running through

21    our platform, they don't call me and say hey, we're

22    pulling this back because this happened, right, but

23    they absolutely might change their decision, and we

24    might absolutely have lost revenue.  I have no

02:12  25    direct evidence.  It doesn't work like that, right.

1    It's damage to the brand.  There's very hard to

2    have any direct correlations there.

3            And again, the reason that our agreement

4    is so broad is specifically because these things

02:12  5    are very hard to directly prove, so that is exactly

6    why they are written largely with our discretion

7    and in our determination because we want to protect

8    our brand, so that's why we have these clauses in

9    the agreements.

02:12  10            MR. ELLIS:  Cindy, can you read -- I'm

11    sorry to ask this question.  The answer was long.

12    Can you read my question, please to Mr. Goss?

13            (Pending question read by reporter)

14            THE WITNESS:  I understand how brands

02:13  15    work.  Our brand would have been damaged by this.

16    So I have no direct correlation between our brand

17    or direct evidence where I can say we lost these

18    $1,000 in advertising spent.  You're correct on

19    that.  I have no direct correlation or direct

02:13  20    evidence.

21            I am concerned about our brand, so I would

22    say that's how we see -- again, we build a brand.

23    We've spent a lot of money on developing it, and we

24    feel that that's how we would lose revenue if it

02:13  25    were damaged.

```
        1    BY MR. ELLIS:

        2        Q.  Let's go to paragraph 14, please.  In

        3    paragraph 14 you make this representation under

        4    oath, Mr. Goss.  "Zeeto does not dispute that DMS

02:14   5    sent traffic during the months in question.

        6    However, it used its authority to withhold payments

        7    while it investigated possible fraud.  Zeeto also

        8    does not dispute that if the traffic had been free

        9    of fraud (as determined by Zeeto), then Zeeto would

02:14   10   owe $944,176.27."

        11        Did I read that correctly?

        12       A.  Yes.

        13       Q.  Did Zeeto on the campaign -- withdraw

        14   that.

02:14   15       In the campaign that DMS and Zeeto were

        16   running in the summer of 2021, did Zeeto collect

        17   advertising dollars for that campaign?

        18       A.  To be clear, there was many campaigns.  It

        19   wasn't just one.  I believe for the ones we are

02:15   20   talking about, the answer is no.

        21       Q.  It didn't?

        22       A.  Not the vast majority at least.  There

        23   might have been a trickle, but it was a very minor

        24   part.

02:15   25       Q.  How did you conclude that in this
```

1    concerned that they were trying to like -- this is

2    going to have a negative impact on our reputation

3    potentially, right.  So that combined with the

4    potential legal issues, we explained this in

02:19    5    numerous e-mails.  DMS was not forthcoming, so we

6    decided to use the option of not paying.

7        And on why did we not pay for everything,

8    realistically if we only didn't pay for fraudulent

9    traffic, then everyone would be incentivized to

02:19    10    send fraudulent traffic because there's no negative

11    consequence because fraudulent traffic is free.

12    There's no cost basis to the publisher to send

13    fraudulent traffic.

14        If we said well, we'll pay you for the

02:19    15    good traffic but not for the bad traffic, A, we

16    would have to argue about what's good and what's

17    bad, which is not an argument that's particularly

18    easy to have, so our agreements are very broadly

19    written to avoid the argument.  And as well, we

02:20    20    want to disincentivize the purposeful sending of

21    any fraud.

22        And we felt that this very much crossed

23    from oh, an affiliate accidentally sent more fraud

24    to somebody at DMS made the decision to pad their

02:20    25    margin for the rest of the time while the Zeeto

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4         I, CYNTHIA ORNELAS, a Shorthand Reporter,

 5    State of California, do hereby certify:

 6         That STEPHAN GOSS, in the foregoing

 7    deposition named, was present and by me sworn as a

 8    witness in the above-entitled action at the time

 9    and place therein specified;

10         That said deposition was taken via

11    videoconference at said time and place, and was

12    taken down in shorthand by me, a Certified

13    Shorthand Reporter of the State of California, and

14    was thereafter transcribed into typewriting, and

15    that the foregoing transcript constitutes a full,

16    true and correct report of said deposition and of

17    the proceedings that took place;

18         That upon conclusion of the proceedings,

19   .review of the transcript was requested;

20         IN WITNESS WHEREOF, I have hereunder

21    subscribed my hand this  26th  day of July 2023.

22

23         _____

24         CYNTHIA ORNELAS, CSR NO. 9402
           State of California
25
```

```
 1                 GOLDEN STATE REPORTING & VIDEO, INC.
                      601 University Avenue, Suite 135
 2                       Sacramento, California 95825
                             (916)489-5900
 3

 4
           July 26, 2023
 5
           Stephan Goss
 6         c/o Jacob Gillick
           PHG Law Group
 7         501 W. Broadway, Suite 1480
           San Diego, CA 92101
 8         jgillick@phglawgroup.com

 9         Re: Digital Media Solutions v. ZeetoGroup, LLC

10         Dear Mr. Goss,

11              The transcript of your deposition taken in
           the above-entitled matter has now been completed.
12         The original transcript will be held in this office
           for 30 days from the date of this letter before it
13         is sealed and forwarded to the deposing attorney.
           You have the right to review, sign and make
14         corrections to your transcript within the 30-day
           period by coming to our office.  Please call the
15         above number to make an appointment for you review.

16              If you are represented by an attorney, I
           advise that you contact your attorney to discuss
17         the matter.  You may read your attorney's copy of
           the transcript and forward any changes to our
18         office by letter or by filling out the correction
           page included in the transcript.
19
                There is no need to contact this office if
20         you do not wish to read your transcript.

21         Sincerely,

22

23
           GOLDEN STATE REPORTING & VIDEO, INC.
24         cc: All Counsel

25
```

## ERRATA SHEET FOR THE TRANSCRIPT OF:

DEPONENT:    STEPHAN GOSS
CASE NAME:    DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC
DATE OF DEPOSITION: 7/24/2023

Note:  If you are adding to your testimony, print the exact words you want to add.  If you are deleting from your testimony, print the exact words you want to delete.  Specify with "Add" or "Delete" and sign below.

Page    Line    Change/Add/Delete

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

Pursuant to Section 2025 (q) (1) of the code of Civil Procedure of the State of California, I hereby certify that I have read my deposition transcript, made those changes and corrections that I deem necessary, and declare under penalty of perjury the testimony therein to be true and correct.

Date:_____Signature:_____

## ERRATA SHEET FOR THE TRANSCRIPT OF:

DEPONENT:    STEPHAN GOSS
CASE NAME:    DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC
DATE OF DEPOSITION: 7/24/2023

Note:  If you are adding to your testimony, print the exact words you want to add.  If you are deleting from your testimony, print the exact words you want to delete.  Specify with "Add" or "Delete" and sign below.

| Page | Line | Change/Add/Delete |
|------|------|-------------------|
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |

Pursuant to Section 2025 (q) (1) of the code of Civil Procedure of the State of California, I hereby certify that I have read my deposition transcript, made those changes and corrections that I deem necessary, and declare under penalty of perjury the testimony therein to be true and correct.

Date:_____ Signature:_____

Deposition of STEPHAN GOSS                    DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC

## ERRATA SHEET FOR THE TRANSCRIPT OF:

DEPONENT:    STEPHAN GOSS
CASE NAME:    DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC
DATE OF DEPOSITION: 7/24/2023

Note:  If you are adding to your testimony, print the exact words you want to add.  If you are deleting from your testimony, print the exact words you want to delete.  Specify with "Add" or "Delete" and sign below.

Page    Line    Change/Add/Delete
____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

Pursuant to Section 2025 (q) (1) of the code of Civil Procedure of the State of California, I hereby certify that I have read my deposition transcript, made those changes and corrections that I deem necessary, and declare under penalty of perjury the testimony therein to be true and correct.

Date:_____Signature:_____

Deposition of STEPHAN GOSS                                    DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC

ERRATA SHEET FOR THE TRANSCRIPT OF:

DEPONENT:     STEPHAN GOSS
CASE NAME:    DIGITAL MEDIA SOLUTIONS, LLC VS. ZEETOGROUP, LLC
DATE OF DEPOSITION: 7/24/2023

Note: If you are adding to your testimony, print the exact words you want to add. If you
are deleting from your testimony, print the exact words you want to delete. Specify with
"Add" or "Delete" and sign below.

| Page | Line | Change/Add/Delete |
|------|------|-------------------|
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |

Pursuant to Section 2025 (q) (1) of the code of Civil Procedure of the State of California,
I hereby certify that I have read my deposition transcript, made those changes and
corrections that I deem necessary, and declare under penalty of perjury the testimony
therein to be true and correct.

Date:_____  Signature:_____