1  Jacob A. Gillick, SBN 312336
   jgillick@PHGLawGroup.com
2  PHG Law Group
   501 West Broadway, Suite 1480
3  San Diego, CA 92101
   Telephone: (619) 826-8060
4  Facsimile: (619) 826-8065

5  Attorneys for Defendant Zeetogroup, LLC

6

7

8              UNITED STATES DISTRICT COURT

9           SOUTHERN DISTRICT OF CALIFORNIA

10

11 DIGITAL MEDIA SOLUTIONS,          Case No. 22CV1184 AHG
   LLC,
12                                    **REPLY MEMORANDUM OF POINTS
                    Plaintiff,        AND AUTHORITIES IN SUPPORT OF
13                                    MOTION FOR SUMMARY
        v.                            JUDGMENT**
14
   ZEETOGROUP, LLC,                   Date:     August 9, 2023
15                                    Time:     1:30 p.m.
                    Defendants.       Dept:     5A
16                                    Judge:    Hon. Allison H. Goddard
17

18

19

20

21

22

23

24

25

26

27

28

# I.

## __INTRODUCTION__

Digital Media Solutions, LLC ("DMS") has submitted an Opposition to ZeetoGroup, LLC's ("Zeeto") Motion for Summary Judgment where it attempts to add terms to the agreement and boldly argue that Zeeto should allow DMS to run fraud through its system.  Both of these arguments lack evidence or logic.

Stephan Goss, CEO of Zeeto, testified to the following:

> [T]here were several instances where Zeeto detected fraudulent traffic in conjunction with DMS.  So we would get together and say hey, this source seems like fraudulent traffic.  You have to pause it.  Because again, we have a total, like we do not want any fraudulent traffic through our platform policy.  So we communicated with DMS, they would effectively pause it.  And so actually also at the same token, when DMS detected fraudulent affiliates, they would also not pay them for their traffic and they would have not paid in full.  So they would not have paid even partial for what was considered real traffic.  They would not have paid for the entire amount.  It's very much industry standard practice that if fraud at a meaningful level is detected that the entire bill is void. So that, I we think DMS did that on several occasions to some of their affiliates." (Exhibit 4, 56:5-23.)

Mr. Goss also testified that:

> When there's any traffic running, any fraudulent traffic running through our platform, even if it doesn't get to a specific advertiser, everyone immediately get's concerned that they are the ones getting the fake traffic.  So if they got the traffic or not is not necessarily indicative of if they were concerned about it if it damaged our reputation for really good quality and if they pulled back budgets or dollars spent.  It's very difficult to exactly have a correlation or quantification on this obviously, but that's why we are so ardent about fighting any rumors, any acts of fraud or fraudulent traffic in our platform.  (Exhibit 4, 77:17-78:6.)

With regards to previous instances of fraud being run through Zeeto's platform by DMS, Mr. Goss testified that:

> Our first assumption is always that the publisher did not do it on purpose and that they were also tricked by the affiliate, right, because that happens frequently.  Finding affiliates, sometimes they are just bad, sometimes they are fraudulent, and we absolutely collaborate with

2

REPLY MOTION FOR SUMMARY JUDGMENT                    22CV1184 AHG

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

our publishers to find that and to cut that off as soon as we possibly can. There's usually a collaboration that happens multiple times with DMS. And in that scenario it does not lead to Zeeto nonpayment. We nonpay when we feel that the publisher purposefully did that or at least endorsed it. So it's a much more extreme measure, and we do not apply that all the time. That's why also it is oat our discretion to do so." (Exhibit 4, 60:8-22.)

Finally, with regards to this specific situation:

When we look at fraud, we use Anura to detect it, right. Generally it's a third-party tool. Its been super reliable. When that spikes substantially, that generally means there's something crazy happening, and we investigate it. When we investigate, we look at the raw data, we make assessments of what is happening there. Generally then we contact the publisher, which we did in this case. And largely the answer I think we got from Rob Camhe [with DMS] was that this was none of our problem and that they could do whatever they wanted because it was not their advertisers, right.

Their whole argument was that even if it was fraud, that we could not oppose that because it was not going to our advertisers, which of course we took objection with because we don't like any fraud traffic running through our platform of any kind. If its going to our advertisers or not, its entirely irrelevant. And we then requested from DMS a lot more data so we could investigate it. The e-mail, I think it was Exhibit 2 or 3 from Fernando, basically they avoided giving us any of the data we actually asked for. They kept giving us stuff we didn't ask for, and it was relatively useless to us to actually investigate.

So the combination of what we felt was certainly no intent to help with the investigation combined with them just kind of pretending like it wasn't even a problem, which I think that was the most unsettling part, right, the idea that they purposely – and in that case I will use fraud in the more legal term because if they were doing it with intent, then not only were they violating the TCPA potentially, but they were also actually defrauding the advertisers by sending them fraudulent traffic knowingly, which I have a huge problem with because those advertisers frequently understand that it runs through the Zeeto platform. . . We felt that the Anura evidence combined with the behavior, with the statements made by Rob made it very clear that Rob, at least Rob was aware that there was a problem, that he felt no obligation to fix it. . . These things were always a thing we would try

to figure out immediately. That was not what happened this time around. . .

3

*__And only why we did not pay for everything. Realistically, if we only didn't pay for fraudulent traffic, then everyone would be incentivized to send fraudulent traffic because there's no negative consequences because fraudulent traffic is free. There's no cost basis to the publisher to send fraudulent. traffic If we said well, we'll pay you for the good traffic but not for the bad traffic, (A) we would have to argue about what's good and what's bad, which is not an argument that's particularly easy to have, so our agreements are very broadly written o avoid the argument. And as well, we want to disincentivize the purposeful sending of any fraud.__* (Exhibit 4, 81:10-84:21.)

DMS's main argument is that it is allowed to run fraud through Zeeto's system and there is nothing Zeeto can do about it. As described below, no such term exists and there is no logical reason to "invite fraud" into Zeeto's system. Instead of complying with the Agreement, DMS is attempting to add new terms which allows fraud and provides a process by which the parties negotiate between valid and fraudulent traffic. It is objectively unreasonable to believe that any company would be ok with fraudulent traffic running through its system and that is why Zeeto had carefully crafted a completely valid and legal agreement which DMS is required to comply with.

### A.    <u>TERMS OF THE AGREEMENT</u>

On or around August 23, 2018, DMS and Zeeto entered into the Publisher Terms of Service Agreement ("Publisher Agreement") attached to the Declaration of Stephan Goss as "Exhibit 1." [Dkt. 39-2, pgs. 6-10.] In terms of services described under the Agreement, DMS was allowed to access the Zeeto Platform comprised of "the Zeeto Technology (as defined [under section one]), and Zeeto's online publisher portal." *Id.* at pg. 6. According to section one of the Agreement, DMS agreed that:

> When engaging in the Zeeto platform and when placing the Zeeto Technology on your website, application, or mobile site, or any other property owned by Publisher (the 'Publisher site') you permit Zeeto to serve questions, advertisements, retargeting cookies and other monetization methods on the Publisher Site. You agree that Zeeto may use the data that is being generated from the Zeeto Technology by

selling it to third parties under the methods approved by the Publisher and in accordance to the revenue share.

Given this relationship where Publishers like DMS supply traffic through procurement methods over which Zeeto has no insight, Zeeto implemented multiple safeguards in its Agreement to prevent DMS, or any other client, from attempting to send fraudulent traffic to Zeeto and then charging them for it. *Id.* at pg. 9, ¶ 9. Pursuant to sections 3(c) through (e) of the Agreement:

c. <u>Prohibited Content</u>. Unless Zeeto provides prior written consent, you may not place the Zeeto Technology on any part of the Publisher Site containing the following:

i.    Deceptive or misleading content, or content that otherwise fails to comply with applicable federal and state consumer protection laws;

ii.   Content that infringes upon the personal rights, trademarks, trade name, logo, publicity right, copyright, or other intellectual property right of any third party;

iii.  Content that would be considered an invasion of privacy, degrading, or libelous;

iv.   Content that is construed as violent, discriminatory, pornographic, or hate speech;

v.    Malware or adware; or

vi.   Content that is illegal, promotes illegal activity, or infringes on the legal rights of others.

d. <u>Deceptive Practices</u>. Zeeto reserves the right to terminate this Agreement and investigate Publisher for deceptive practices at its sole discretion. "Deceptive Practices" for the purposes of this Agreement include, but are not limited to, the following:

i.    Using fake redirects, automated software, fraud, or acting in any way to generate false clicks or leads ("Click Fraud");

ii.   Generating multiple leads using proxy servers;

iii.  Using iFrames, hidden frames, or redirects; and/or

/ / /

REPLY MOTION FOR SUMMARY JUDGMENT                    22CV1184 AHG

iv.    Any method in which you use the Zeeto platform in attempt to increase your revenue in dishonest or deceitful way that harms the quality of the Zeeto Platform and its users.

e. <u>Damages</u>. If Zeeto determines that Publisher has violated any portion of this Section 3, Zeeto may withhold payment owed to Publisher. Further, if Publisher violates Section 3(d), the Publisher agrees to pay an amount equal to $100,000 in liquidated damages. Publisher agrees that the liquidated damages constitutes compensation and are not construed as a penalty. Publisher acknowledges that actual damages may be difficult to current estimate or determine based on a breach of Section 3(d) and that the liquidated damages are a reasonable estimate of the anticipated or actual harm that may arise from a breach of this Section 3(d).

According to section four (4) of the Agreement:

You acknowledge and agree that Zeeto's tracking statistics will be used to determine the numbers upon which payment is made. Zeeto will not pay Publisher in the case of (as Zeeto may determine in its sole discretion): spam, fraud, submission of false leads/data, violation of the Agreement, and any other way the Publisher (or a third party on Publisher's behalf) may use to artificially inflate revenues or disadvantage advertisers in any way.

The Agreement defines "fraudulent traffic," provides Zeeto with authority to withhold payments and investigate fraud, and finally the authority to "not pay Publisher" as it determines in its "sole discretion."

## B.    DMS Ran Fraudulent Traffic Through Zeeto's Platform

Zeeto, despite having the right to determine what is fraudulent traffic in its "sole discretion," has obtained third party verification that DMS was running fraudulent traffic through ZAN.

Anura, a third-party company not named in this lawsuit, provides to Zeeto "[t]he world's most accurate fraud solution [that] protects your web assets by eliminated bots, malware and human fraud, ensuring your content is seen by real people."  See, *www.anura.io.*  Its mission is to "increase our client's growth and improve their marketing results through accurate and effective ad fraud mitigation. Our team of ad fraud experts has navigated trillions of requests for our customers,

REPLY MOTION FOR SUMMARY JUDGMENT                    22CV1184 AHG

1    and at the end of the day, our expertise, ethics, and total dedication is the secret

2    sauce to not only our success – but your success."  See, *www.anura.io/about-us.*

3        Specifically with regards to services provided to companies like Zeeto, "Ad

4    fraud is the practice of viewing, clicking, converting, or generating false

5    interactions with any web asset for the sole purpose of earning money directly or

6    indirectly.  Ad fraud can be committed by bots, malware, or humans." See,

7    *www.anura.io/ad-fraud-detection.*  Anura is a top provider of fraud detection that

8    Zeeto has been working with for years to protect its properties.  [Dkt. 39-2, ¶ 10.]

9    Further, Anura is so well trusted in the industry, that DMS itself also used Anura to

10    monitor traffic it was purchasing, clearly showing that Anura is a trusted third party

11    by everyone, even DMS.  *Id.* at ¶ 11.

12        Attached to the Declaration of Stephan Goss as "Exhibit 2" is an Anura

13    report run from April 1, 2021, through June 30, 2021, of DMS's traffic through the

14    ZAN platform.  [Dkt, 39-2, ¶ 12.]  On the second page, the "Bad" traffic is

15    indicated by a red line which shows virtually zero instances of fraudulent traffic all

16    the way through June 30, 2021.  *Id.* at pgs. 12-18.

17        Attached to the MSJ Declaration of Stephan Goss as "Exhibit 3" is an Anura

18    report run from July 1, 2021, through September 30, 2021. [Dkt. 39-2, ¶ 13.]  On

19    the second page, the "Bad" traffic is significantly higher with the largest spike

20    occurring around September 26, 2021, with around 25,000 instances of fraudulent

21    traffic being flagged.  *Id.* at pgs. 20-27.  These instances of fraud gave Zeeto the

22    authority to not pay DMS pursuant to sections three and four of the Agreement.

23    ## C.    **Fraudulent Traffic**

24        DMS argues that there has been no proof of fraudulent traffic.  This is

25    simultaneously untrue and irrelevant.  According to the Agreement, Zeeto is

26    allowed to find "in its sole discretion" instances of fraud.  Not only has it found

27    instances of fraud, but third party Anura has confirmed that there were very large

28    waves of increased fraud during the relevant period in 2021.  It is also undisputed

7

that Zeeto attempted to resolve these issues with DMS before deciding not to pay DMS.  (Exhibit 4, 81:10-84:21.)

### D.    DMS is Attempting to Add Terms to the Agreement to Avoid Summary Judgment on its Breach of Contract Claim

According to the Agreement: "If Zeeto determines that Publisher has violated any portion of this Section 3, Zeeto may withhold payment owed to Publisher." [Dkt. 39-2, pg. 7, § 3(e).]  Zeeto did this while it investigated DMS's traffic.  *Id.* at ¶ 14.  According to section four: "Zeeto will not pay Publisher in the case of (as Zeeto may determine in its sole discretion): spam, fraud, submission of false leads/data, violation of the Agreement, and any other way the Publisher (or a third party on Publisher's behalf) may use to artificially inflate revenues or disadvantage advertisers in any way." *Id.* at pg. 7, § 4.  These terms are not ambiguous, and any other interpretation would be a re-writing of the Agreement which Zeeto did not bargain for.

Zeeto is explicitly named by the agreement as to who makes the determination of if there was fraudulent traffic.  Zeeto, in its "sole discretion" determines if there had been a violation of section 3(d).  Zeeto, in its sole discretion, has determined that there was fraudulent traffic and therefore withheld payment during investigation before eventually deciding not to pay for the fraudulent traffic.  [Dkt. 39-2, ¶ 15.]  Even further, and although there is no requirement for third-party verification or any need to provide the fraud, Zeeto obtained Anura reports evidencing a significant spike in fraudulent traffic sent by DMS.  [Dkt. 39-2, pgs. 12-27.]  Based on this fraud, and section 3(e) of the Agreement, Zeeto is allowed to withhold payments to DMS and is even entitled to $100,000 in damages.  [Dkt. 39-2, pg. 7, §3(e).]

/ / /

/ / /

/ / /

## II.

### There is No Dispute that Zeeto has the Contractual Right to Protect itself from Fraud and DMS's Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing Fails

DMS argues that the Agreement is invalid and Zeeto is not allowed to withhold payment when someone perpetrates fraud through its system.  Not only is this type of provision the industry standard, but DMS bargained and agreed to the provision.

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement made.  The covenant thus cannot 'be endowed with an existence independent of its contractual underpinnings.'  It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 349-350 (2000).  This cause of action fails as there is no dispute that Zeeto has sole discretion to determine fraud and not make payments.  [Dkt. 39-2, pgs. 6-7, § 3-4.]  There can be no violation of an implied duty when Zeeto has the express written right.

Section 3(d) of the Agreement states that "Zeeto reserves the right to terminate this Agreement and investigate Publisher for deceptive practices at its sole discretion."  Section 3(e) states that: "If Zeeto determines that Publisher has violated any portion of this Section 3, Zeeto may withhold payment owed to Publisher."  According to section four: "Zeeto will not pay Publisher in the case of (as Zeeto may determine in its sole discretion): spam, fraud, submission of false leads/data, violation of the Agreement, and any other way the Publisher (or a third party on Publisher's behalf) may use to artificially inflate revenues or disadvantage advertisers in any way."  *Id.* at pg. 7, § 4.  In addition to being granted sole discretion, Zeeto has also obtained third party verification from Anura that DMS

9

1    was running significant fraudulent traffic through ZAN.  [Dkt. 39-2, pgs. 12-27.].

2    Anura is a valuable tool used industrywide, even by DMS itself.

3        Zeeto had the contractual right to, in its sole discretion, determine if there

4    was fraud or not. Zeeto also worked with DMS to try and resolve these issues

5    before making the decision not to pay.  Exhibit 4, 81:10-84:21.  DMS's claim of a

6    violation of the implied duty of good faith and fair dealing fails because DMS gave

7    the right to make this decision to Zeeto and any other interpretation of the

8    Agreement would essentially be adding new terms which Zeeto did not bargain for.

9    Zeeto could not have breached the implied duty of good faith and fair dealing.

10   Therefore, Plaintiff's Second Cause of Action should be dismissed with prejudice.

### III.

### DMS's UCL Claims Fail

13       DMS argues that "Zeeto's platform generated substantial revenue to Zeeto's

14   benefit, which was to be shared with DMS."  [Dkt. 40, 15:21-22.]  This is patently

15   untrue and contradicted by the deposition testimony of Stephan Goss, the Chief

16   Executive Officer of Zeeto.

17       DMS agreed that Zeeto has sole discretion to determine if fraud had occurred

18   and to not make payment in the event it determines fraud.  [Dkt. 39-2, pgs. 6-7, § 3-

19   4.]  There is no dispute as to the validity of the Agreement or the meaning of its

20   terms and therefore no valid cause of action against Zeeto exists.  It was DMS that

21   engaged in acts of unfair competition by using deceptive practices and running

22   fraudulent traffic through ZAN. Zeeto attempted to resolve these issues but DMS

23   refused to work with Zeeto like it had in the past—indicating intentional fraud.

24   Exhibit 4, 81:10-84:21.

25       Finally, Plaintiff's allegation that Zeeto failed or refused "to cooperate with

26   Plaintiff in good faith, including, but not limited to, improperly rejecting Plaintiff's

27   performance for invalid reasons" should be dismissed.  [Dkt. 1, ¶ 23.]  Section 3(d)

28   of the Agreement expressly states that "Zeeto reserves the right to terminate this

Agreement and investigate Publisher for deceptive practices at its sole discretion."
According to section four: "Zeeto will not pay Publisher in the case of (as Zeeto
may determine in its sole discretion): spam, fraud, submission of false leads/data,
violation of the Agreement, and any other way the Publisher (or a third party on
Publisher's behalf) may use to artificially inflate revenues or disadvantage
advertisers in any way."  [Dkt. 39-2, pg. 7, § 4.]

Despite not needing any evidence to withhold payments to DMS, Zeeto has
reports from a third-party auditor, Anura, proving that DMS ran a large amount of
fraudulent traffic in late 2021.  [Dkt. 39-2, pgs. 20-27.]  Therefore, there is no
dispute that the Agreement is valid, that Zeeto had sole discretion to determine
fraud, that Zeeto has third-party verifications of fraud, and that Zeeto had the right
to withhold payments.  This Third Cause of Action for unfair business practices
should be dismissed with prejudice.

### IV.

### CONCLUSION

DMS filed this suit, fully knowing based on the contract that they had no
probable cause and their purposeful actions of sending fraudulent traffic through
ZAN would lead to all their payments being withheld.  As established herein, there
was a valid Agreement between the parties, DMS ran fraudulent traffic through
ZAN, and Zeeto had the right to withhold payment of invoices.  This is not a matter
which requires trial.  Therefore, Zeeto requests all causes of action against it be
dismissed with prejudice.

Respectfully submitted,

**PHG Law Group**

Dated:  August 2, 2023        *s/ Jacob A. Gillick*_____
                              Jacob A. Gillick, Esq.
                              jgillick@PHGLawGroup.com
                              Attorneys for Defendant Zeetogroup, LLC

EXHIBIT 4

US DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---oOo---

DIGITAL MEDIA SOLUTIONS,
LLC,

              Plaintiff,

-vs-                    CASE NO. 22CV01184 JLS-AHG

ZEETOGROUP, LLC,

              Defendant.
_____/

**CERTIFIED COPY**

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

STEPHAN GOSS

July 24, 2023

Reported By: Cynthia Ornelas, CSR 9402

1    Q.  Do you recall whether there were any

2   affiliates that were participating with Zeeto and

3   DMS in the campaigns they were running in the

4   summer of 2020?

01:23   5    A.  I remember there were several instances

6   where Zeeto detected fraudulent traffic in

7   conjunction with DMS.  So we would get together and

8   say hey, this source seems like fraudulent traffic.

9   You have to pause it.  Because again, we have a

01:23   10   total, like we do not want any fraudulent traffic

11   through our platform policy.  So we communicated

12   with DMS, they would effectively pause it.

13          And so actually also at the same token,

14   when DMS detected fraudulent affiliates, they would

01:23   15   also not pay them for their traffic and they would

16   have not paid in full.  So they would not have paid

17   even partial for what was considered real traffic.

18   They would not have paid for the entire amount.

19          It's very much industry standard practice

01:23   20   that if fraud at a meaningful level is detected

21   that the entire bill is void.  So that, I think DMS

22   did that on several occasions to some of their

23   affiliates.

24    Q.  What is the industry practice for a

01:24   25   meaningful level?  We attorneys, or if you're an

1    A.  Yes.  Correct.  That's why, for example,

2    we have Anura much later in our funnel.  So we

3    don't run Anura everywhere.  We really focus our

4    analysis on the later in the funnel.  So any time

01:28    5    we look Anura stats, we look at the later down the

6    road so we avoid those type of false positives.

7    Because again, we are trying in all of

8    these scenarios, our first assumption is always

9    that the publisher did not do it on purpose and

01:28    10    that they were also tricked by the affiliate,

11    right, because that happens frequently.

12    Finding affiliates, sometimes they are

13    just bad, sometimes they are fraudulent, and we

14    absolutely collaborate with our publishers to find

01:28    15    that and to cut that off as soon as we possibly

16    can.  There's usually a collaboration that happens

17    multiple times with DMS.  And in that scenario it

18    does not lead to Zeeto nonpayment.  We nonpay when

19    we feel that the publisher purposefully did that or

01:28    20    at least endorsed it.  So it's a much more extreme

21    measure, and we do not apply that all the time.

22    That's why also it is at our discretion to do so.

23    Q.  To finish up on this d little Roman

24    Numeral i, to get where I'm at now, it says,

01:29    25    "Deceptive Practices for the purposes of agreement

1    that Mr. Cardwell told me that several people have

2    commented and that any fraudulent anything is

3    always bad for us, right.  We try to stand out in

4    the industry of not having these things happen, and

02:09    5    I believe Mr. Chris McKibbin got questions as well.

6          A lot of these are conferences like

7    affiliate summit, et cetera.  I do not go to those

8    conferences.  No one contacted me directly about

9    them, so I don't know the details beyond what two

02:10    10    direct employees have told me about those

11    conversations.

12        Q.  Fair enough.  What they have told you

13    about the conversation is that someone has

14    commented on the DMS lawsuit?

02:10    15        A.  They were commenting, they got several

16    questions about it.  And I believe -- the problem

17    with these things is, right, when there's any

18    traffic running, any fraudulent traffic running

19    through our platform, even if it doesn't get to a

02:10    20    specific advertiser, everyone immediately gets

21    concerned that they are the ones getting the fake

22    traffic.

23          So if they got the traffic or not is not

24    necessarily indicative of if they were concerned

02:10    25    about it.  If it damaged our reputation for really

1    good quality and if they pulled back budgets or

2    dollar spent.  It's very difficult to exactly have

3    a correlation or quantification on this obviously,

4    but that's why we are so ardent about fighting any

02:10    5    rumors, any acts of fraud or fraudulent traffic in

6    our platform.

7        Q.  I'm concerned about facts.  Again, the

8    subpoena that you've received, what the facts are

9    of that lawsuit and what generated that lawsuit you

02:11    10    just don't know, correct?

11        A.  Correct.  I don't know the details of it.

12        Q.  So with respect to you have no information

13    as you sit here today that you have, when I say

14    you, Zeeto, has lost any advertising revenue

02:11    15    because of this campaign that DMS was running in

16    the summer of 2021; isn't that true?

17        A.  Well, we build a brand that is very

18    heavily built on not having false traffic run

19    through our platform.  So if people think that

02:11    20    false traffic or fake traffic is running through

21    our platform, they don't call me and say hey, we're

22    pulling this back because this happened, right, but

23    they absolutely might change their decision, and we

24    might absolutely have lost revenue.  I have no

02:12    25    direct evidence.  It doesn't work like that, right.

1    paragraph under oath that but for the 30 percent I

2    think by your calculation of problematic hits, that

3    DMS wasn't owed any money at all?

4        A.  So several points there.  So we do not

02:16    5    determine if it was fraud or not by looking at the

6    campaigns.  We look at the user registration data

7    because that's where the fraud occurs.  And once we

8    hand it off to the advertiser, it gets extremely

9    difficult.  We have no insights there.

02:16    10        When we look at fraud, we use Anura to

11    detect it, right.  Generally it's a third-party

12    tool.  It's been super reliable.  When that spikes

13    substantially, that generally means there's

14    something crazy happening, and we investigate it.

02:16    15        When we investigate, we look at the raw

16    data, we make assessments of what is happening

17    there.  Generally then we contact the publisher,

18    which we did in this case.  And largely the answer

19    I think we got from Rob Camhe was that this was

02:16    20    none of our problem and that they could do whatever

21    they wanted because it was not their advertisers,

22    right.  Their whole argument was that even if it

23    was fraud, that we could not oppose that because it

24    was not going to our advertisers, which of course

02:16    25    we took objection with because we don't like any

1    fraud traffic running through our platform of any

2    kind.   If it's going to our advertisers or not,

3    it's entirely irrelevant.

4              And we then requested from DMS a lot more

02:17  5    data so we can investigate it.   The e-mail, I think

6    it was Exhibit either 2 or 3 from Fernando,

7    basically they avoided giving us any of the data we

8    actually asked for.   They kept giving us stuff we

9    didn't ask for, and it was always relatively

02:17  10   useless to us to actually investigate.

11             So the combination of what we felt was

12   certainly no intent to help with the investigation

13   combined with them just kind of pretending like it

14   wasn't even a problem, which I think that was the

02:17  15   most unsettling part, right, the idea that them

16   purposely -- and in that case I will use fraud in

17   the more legal term because if they were doing it

18   with intent, then not only were they violating the

19   TCPA potentially, but they were also actually

02:17  20   defrauding the advertisers by sending them

21   fraudulent traffic knowingly, which I have a huge

22   problem with because those advertisers frequently

23   understands that it runs through the Zeeto

24   platform.

02:18  25             So we did a whole investigation into all

1    of this, and based on that -- and by the way, the

2    agreements are very clear on this.  We do not have

3    to pay any amount if we detect fraud.  And we

4    felt -- and again, it's under our discretion and

02:18    5    determined by us.  We felt that the Anura evidence

6    combined with the behavior, with the statements

7    made by Rob made it very clear that Rob, at least

8    Rob was aware that there was a problem, that he

9    felt no obligation to fix it.

02:18    10    Then there was the refusal of actually

11    supplying us data, which we felt was quite

12    suspicious.  Generally speaking in the past -- oh,

13    and Matt Stern who was the guy that used to control

14    this was very helpful.  These things were always a

02:18    15    thing we would try to figure out immediately.  That

16    was not what happened this time around.

17    So we felt that this was a very different

18    occurrence.  We felt that largely this was, they

19    were about to leave, and they were burning it down

02:19    20    on the way out, right, so they felt very much that

21    they were leaving, moving to their own platform,

22    and they were using that as like this is not our

23    problem anymore.  Let's stick Zeeto with the issue

24    type thing.

02:19    25    It was very much a combination of we were

1    concerned that they were trying to like -- this is

2    going to have a negative impact on our reputation

3    potentially, right.  So that combined with the

4    potential legal issues, we explained this in

02:19  5    numerous e-mails.  DMS was not forthcoming, so we

6    decided to use the option of not paying.

7            And on why did we not pay for everything,

8    realistically if we only didn't pay for fraudulent

9    traffic, then everyone would be incentivized to

02:19  10   send fraudulent traffic because there's no negative

11   consequence because fraudulent traffic is free.

12   There's no cost basis to the publisher to send

13   fraudulent traffic.

14           If we said well, we'll pay you for the

02:19  15   good traffic but not for the bad traffic, A, we

16   would have to argue about what's good and what's

17   bad, which is not an argument that's particularly

18   easy to have, so our agreements are very broadly

19   written to avoid the argument.  And as well, we

02:20  20   want to disincentivize the purposeful sending of

21   any fraud.

22           And we felt that this very much crossed

23   from oh, an affiliate accidentally sent more fraud

24   to somebody at DMS made the decision to pad their

02:20  25   margin for the rest of the time while the Zeeto

REPORTER'S CERTIFICATE

 

 

    I, CYNTHIA ORNELAS, a Shorthand Reporter,
State of California, do hereby certify:

    That STEPHAN GOSS, in the foregoing
deposition named, was present and by me sworn as a
witness in the above-entitled action at the time
and place therein specified;

    That said deposition was taken via
videoconference at said time and place, and was
taken down in shorthand by me, a Certified
Shorthand Reporter of the State of California, and
was thereafter transcribed into typewriting, and
that the foregoing transcript constitutes a full,
true and correct report of said deposition and of
the proceedings that took place;

    That upon conclusion of the proceedings,
review of the transcript was requested;

    IN WITNESS WHEREOF, I have hereunder
subscribed my hand this 26th day of July 2023.


_____
CYNTHIA ORNELAS, CSR NO. 9402
State of California